**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN BREEDEN**,** | |
| Plaintiff, | Case No. 1:18-CV-5841 |
| v. | |
| | **Trial by jury demanded.** |
| ACT DENTAL PRACTICE COACHING CORPORATION, KIRK BEHRENDT, and BARBARA JAMES, | |
| Defendants. | |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, by and through his attorneys, The Case Law Firm, LLC, and for his Complaint against Defendants states as follows:

### <u>JURISDICTION & VENUE</u>

1.      Plaintiff John Breeden ("Plaintiff") was at all relevant times a resident and citizen of Chicago, Cook County, Illinois.

2.      Defendant ACT Dental Practice Coaching Corporation ("Defendant ACT") is and was at all relevant times a Nevada Corporation.

3.      Defendant Kirk Behrendt ("Defendant Behrendt") is and was at all relevant times Chief Executive Officer ("CEO") of Defendant ACT and a resident and citizen of Whitefish Bay, Milwaukee County, Wisconsin.

4.      Defendant Barbara James ("Defendant James") is and was at all relevant times Chief Financial Officer ("CFO") of Defendant ACT and a resident and citizen of Overland Park, Johnson County, Kansas.

5. This court has jurisdiction over this matter pursuant to 29 U.S.C. 1332 in that the parties are residents of different states and the amount in controversy exceeds $75,000 exclusive of costs.

6. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(b) in that the conduct which gives rise to this action occurred in Chicago, Cook County, Illinois.

## FACTS

7. Defendant ACT is a dental consulting business that works with dental practices to improve general business management, team dynamics, and leadership skills.

8. In or around November of 2016, Defendant Behrendt began talking to Plaintiff about hiring him to expand Defendant ACT into the Chicago area and to assist in further developing ACT's services.

9. At that time, Plaintiff worked full-time for Slalom Consulting ("Slalom"). He had joined Slalom as a Consultant in 2013 and had been promoted to Principal Consultant in April of 2016.

10. At a meeting between Plaintiff and Defendant Behrendt at a restaurant in Chicago, Illinois, Plaintiff told Defendant Behrendt that he was happy at Slalom, disclosed the salary range and benefits he was earning there, and explained that, if he was going to consider leaving Slalom, Defendant ACT would have to make him an offer of employment which exceeded his then current pay and benefits.

11. On or around April 10, 2017, Plaintiff sent Defendant Behrendt a document outlining a number of potential terms which Defendant ACT would have to meet if Defendants wanted him to leave his job with Slalom and begin working for Defendant ACT. That list of

terms set out a number of types of compensation, including but not limited to salary, 401(k) contributions, and equity in Defendant ACT. The list included a chart labeled "Equity Structure" which identified varying equity levels Plaintiff would hold in Defendant ACT depending upon the company's valuation. Plaintiff also sent a copy of this document to Defendant James.

12.     Thereafter, on or around May 8, 2017, Defendant Behrendt and Defendant James, contacted Plaintiff by phone at his home in Chicago, Illinois and made him an offer of employment.

13.     After discussing the terms of the employment offer by phone, Defendant Behrendt sent Plaintiff a text message stating that he was "going to have Barb [Defendant James] send over the agreement tonight."

14.     Later that night, Defendant James sent Plaintiff an email containing a formal offer of employment to serve as Defendant ACT's Chief Operating Officer ("COO").

15.     The offer identified a start date of July 5, 2017 and included a number of the essential terms of Plaintiff's potential employment with the company which he had identified in the document he sent to Defendants Behrendt and James in April of 2017. Those terms included but were not limited to the salary, a payment schedule, the duties and responsibilities of the position, and the associated benefits and allowances.

16.     On or around May 9, 2017, Plaintiff responded via email to Defendant ACT's employment offer by proposing, among other things, (1) that the offer include a tiered, valuation-based equity compensation plan (the "Equity Plan") as he had proposed in the April 2017 document, (2) that Plaintiff be allowed to rent working space until full-time offices were established in Chicago, and (3) that he be allowed discretionary time off with advanced notice to the company.

3

17. On or around May 10, 2017, Defendant James responded to Plaintiff's revised proposal via email by stating that "everything looks great," and by making one modification to Plaintiff's proposed terms – specifically, to state that his budget to rent working space until the full-time office was established in Chicago would be capped at $500 per month. Defendant James concluded the email by thanking Plaintiff and welcoming him to Defendant ACT.

18. Neither Defendant James, Defendant Behrendt, nor any other agent of Defendant ACT objected to Plaintiff's demand that he be entitled to equity in the company under the Equity Plan.

19. Plaintiff accepted Defendant ACT's revised offer, resigned from Slalom, and began working as Defendant ACT's COO on July 5, 2017 in accordance with the terms of the employment offer.

20. Thereafter, Defendant ACT compensated Plaintiff at the rate agreed upon in his email exchange with Defendant James, reimbursed Plaintiff's expenses as the parties had agreed, followed the "discretionary time off" policies which Plaintiff had proposed, and complied with its other obligations under the agreed upon terms of Plaintiff's employment.

21. The aforementioned exchanges between Plaintiff and Defendants serve as the only memorialization of Plaintiff's employment agreement (the "Employment Agreement") with Defendant ACT.

22. Under the terms of the Employment Agreement, Plaintiff's equity interest in Defendant ACT under the Equity Plan is set at between 5 and 15 percent, with the precise amount depending on ACT's valuation. On information and belief, Defendant Behrendt, Defendant James, and another ACT employee also either currently hold or were promised an equity share in ACT.

23.     Shortly after Plaintiff began working for Defendant ACT, Plaintiff realized that Defendant Behrendt regularly charged personal expenses to the company, failing to reimburse the company for those expenses, and then writing those expenses off as business-related for tax purposes.  Plaintiff also learned that Defendant Behrendt regularly took personal distributions from Defendant ACT and, with the assistance of Defendant James, misclassified and/or omitted those distributions from Defendant ACT's financial records.  Moreover, Defendant Behrendt's sizeable distributions to himself often left Defendant ACT's bank account in arrears so that Defendant ACT was unable to pay its creditors.  (The conduct referred to in this paragraph will be hereinafter referred to as "Defendant Behrendt's improper business practices.")

24.     Plaintiff reasonably believed that Defendant Behrendt's improper business practices violated state and federal tax laws and also violated Nevada's state statutes governing private corporations.

25.     In or around September of 2017, Plaintiff began to raise concerns with Defendant Behrendt and Defendant James regarding Defendant Behrendt's improper business practices. Plaintiff complained about those practices repeatedly, both in weekly status calls with Defendant ACT's officers and also in one-on-one conversations with Defendant James and Defendant Behrendt.

26.     Defendant Behrendt was initially receptive to Plaintiff's concerns, saying that he would look into the matters to determine if he needed to change his policies or practices. However, when nothing changed, and Plaintiff continued to raise his concerns regarding Defendant Behrendt's improper business practices, Defendant Behrendt became defensive and combative stating that ACT was his company and he would "do whatever [he] want[ed]" and that Plaintiff "[did] not understand how much money it takes to have a family."

27.    In or around mid-October of 2017, Plaintiff again raised his concerns regarding Defendant Behrendt's improper business practices during a phone call with Defendant Behrendt who responded that Plaintiff "[did] not know what [he was] talking about" and that he was no longer going to listen to Plaintiff on these issues.

28.    Then, on October 29, 2017, just two weeks later, Defendant Behrendt called Plaintiff in Chicago and terminated his employment.  Defendant Behrendt explained that Defendant ACT was "moving in a different direction" and that Plaintiff "[did] not fit into that vision."

29.    Prior to his termination, no one at Defendant ACT had provided Plaintiff with any corrective feedback or any indication that the company was not happy with his performance as COO or with his "fit."  Nor had anyone at Defendant ACT indicated a change in the company's vision or strategies to Plaintiff.

30.    Following his termination from Defendant ACT and pursuant to the Employment Agreement, Plaintiff requested financial information from the company so that a valuation could be performed to determine his current equity stake under the Equity Plan. Defendant ACT refused to provide Plaintiff with this information, contending that, contrary to the terms of the Employment Agreement, Plaintiff does not own an equity interest in Defendant ACT.

## COUNT I
## BREACH OF CONTRACT
## AGAINST DEFENDANT ACT

31.    Plaintiff incorporates the preceding paragraphs 1-30 as though fully set forth in this Count I.

32.    On or around May 8, 2017, Defendant ACT extended Plaintiff an offer of employment to serve as the company's COO in exchange for certain compensation and benefits.

The offer clearly stated the nature and responsibilities of the position being offered to Plaintiff, the start date, and specified how Plaintiff would be compensated.

33.     The following day, Plaintiff responded to Defendant ACT's offer by extending his own modified offer specifying, in part, that he would be entitled to equity in ACT under the Equity Plan.

34.     Defendant ACT communicated one revision to Plaintiff's modified offer but otherwise accepted Plaintiff's revised terms, stating "everything looks great." With this response, the parties established an explicit contract for employment (the "Employment Agreement").

35.     Plaintiff fulfilled his obligations under the Employment Agreement when he began working for Defendant ACT as the company's COO on or around July 5, 2017.

36.     Defendant ACT has breached the Employment Agreement by refusing to recognize Plaintiff's equity interest in Defendant ACT and by refusing to provide Plaintiff with the financial information necessary to determine his specific equity interest under the valuation-based tiers of the Equity Plan.

37.     Plaintiff has sustained substantial damages as a direct, foreseeable, and proximate result of Defendant ACT's actions.

**WHEREFORE**, Plaintiff prays for a judgement to be entered in his favor and against Defendant ACT for the value of his equity stake in the company, attorney's fees and costs, pre-judgement interest, post-judgement interest, and for such other and further relief as the Court deems just and proper.

## COUNT II
## PROMISSORY ESTOPPEL
## AGAINST DEFENDANT ACT

7

38. Plaintiff incorporates the preceding paragraphs 1-30 as though fully set forth in this Count II.

39. On or about May 10, 2017, Defendant ACT unambiguously promised Plaintiff that if he joined Defendant ACT as the company's COO, he would be entitled to an equity interest in ACT under the tiered Equity Plan Plaintiff had proposed on April 10, 2017 and May 9, 2017.

40. Plaintiff relied on this promise by resigning from his employment with Slalom and joining Defendant ACT as the company's new COO.

41. Plaintiff's reliance was reasonable, expected and foreseeable by Defendant ACT given that the promise was communicated by ACT's CFO and VP of Operations, Defendant James, who had been previously involved in negotiations regarding Plaintiff's employment with ACT and who had been given explicit authority by Defendant Behrendt, Defendant ACT's CEO, to extend a written employment offer.

42. Plaintiff's reliance was to his detriment in that Defendant ACT terminated him less than four months later and has since refused to recognize his equity interest in the company.

43. As a direct and proximate result of Plaintiff's reliance on Defendant ACT's promises, Plaintiff has suffered damages including but not limited to lost wages, lost benefits, and the value of his equity interest in Defendant ACT.

**WHEREFORE**, Plaintiff prays for a judgement to be entered in his favor and against Defendant ACT for lost wages, lost benefits, the value of his equity interest in Defendant ACT, attorney's fees and costs, pre-judgement interest, post-judgement interest, and for such other and further relief as the Court deems just and proper.

## COUNT III
## FRAUDULENT MISREPRESENTATION

8

## AGAINST ALL DEFENDANTS

44.     Plaintiff incorporates the preceding paragraphs 1-30 as though fully set forth in this Count III.

45.     Defendants made a false statement of material fact to Plaintiff when they promised Plaintiff an equity share in Defendant ACT under the tiered Equity Plan as part of his compensation as COO.

46.     Defendants made this statement knowing it was false.

47.     Defendants' false statement was part of a scheme to defraud Plaintiff in that a) Defendants engaged in ongoing negotiations before ultimately making the false statement promising Plaintiff an equity interest in Defendant ACT; and b) Defendants made this statement knowing that it was false and that they did not intend to keep it.

48.     Defendants made this statement for the purpose of inducing Plaintiff to leave his job with Slalom and join Defendant ACT as the company's COO.

49.     Plaintiff relied on Defendants' false statement of material fact when he resigned from Slalom and joined Defendant ACT as the company's new COO.

50.     Plaintiff's reliance was to his detriment in that Defendants have terminated his employment and refused to recognize his equity interest in the company.

51.     Plaintiff would not have accepted the position as ACT's COO if he had known that Defendants' promise of an equity share in Defendant ACT was, in fact, a false statement.

52.     As a direct and proximate result of Plaintiff's justifiable reliance on Defendants' false statements concerning the Equity Plan, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, and the value of his equity in Defendant ACT.

**WHEREFORE**, Plaintiff prays for a judgement to be entered in his favor and against Defendants for lost wages, lost benefits, the lost value of his equity in Defendant ACT, compensatory damages, punitive damages, attorney's fees and costs, pre-judgement interest, post-judgement interest, and for such other and further relief as the Court deems just and proper.

### COUNT IV
### UNJUST ENRICHMENT
### AGAINST DEFENDANT ACT

53.     Plaintiff incorporates the preceding paragraphs 1-30 as though fully set forth in this Count IV.

54.     Plaintiff agreed to work as Defendant ACT's COO in exchange for the promise of, amongst other things, an equity share in the company under the tiered Equity Plan which he proposed.

55.     Plaintiff worked for Defendant ACT as the company's COO from July of 2017 through his termination in October of 2017.

56.     Defendant ACT failed to provide Plaintiff with the promised equity interest in the company under the Equity Plan.

57.     Defendant ACT was unjustly enriched and has retained improper benefits through its retention of Plaintiff's services as COO from July through October of 2017 and the retention of Plaintiff's equity interest in the company.

58.     This unjust enrichment is to Plaintiff's detriment where he resigned from his position with Slalom and gave Defendant ACT the value of his services for nearly four months, but where Defendant ACT has refused to provide him with the equity share it promised to him.

59.     Defendant ACT's retention of these benefits violates the principles of equity, justice, and good conscience.

60.     It is inequitable for Defendant ACT to retain the benefit that it received as a result of its breach of contract and its fraudulent conduct as set forth in Counts I, II and III above.

61.     Defendant ACT continues to refuse to remit payment for the amount it owes Plaintiff and refuses to grant Plaintiff access to Defendant ACT's financial documents which are necessary to ascertain Plaintiff's exact equity interest in accordance with the Equity Plan.

**WHEREFORE**, Plaintiff prays that the Court order Defendant ACT to provide Plaintiff with financial documents such that Plaintiff may ascertain the percentage of equity in Defendant ACT to which he is entitled; order Defendant ACT to disgorge to Plaintiff the equity interest to which Plaintiff is entitled; and provide any additional equitable relief this Court believes to be just and proper.

## COUNT V
## RETALIATORY DISCHARGE
## AGAINST DEFENDANT ACT

62.     Plaintiff incorporates the preceding paragraphs 1-30 as though fully set forth in this Count V.

63.     During his time working as Defendant ACT's COO, Plaintiff repeatedly objected to Defendant Behrendt's practices of: a) charging personal expenses to the company and writing them off as business-related expenses for tax purposes; b) taking personal distributions from Defendant ACT which left the company's bank account in arrears so that Defendant ACT was unable to pay its creditors; and c) misclassifying and/or omitting those personal distributions from Defendant ACT's financial records.

64.     Plaintiff reasonably believed that this conduct violated state and federal tax laws and also violated Nevada's state statutes governing private corporations.

65.     Defendant ACT terminated Plaintiff in retaliation for reporting and objecting to what he reasonably believed to be unlawful conduct by the company.

66.     Plaintiff's discharge violates Illinois' public policy.

67.     As a direct and proximate result of Defendant's decision to discharge Plaintiff in retaliation for his complaints, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, the lost value of his equity share, humiliation, embarrassment, and emotional distress.

**WHEREFORE**, Plaintiff prays for judgement to be entered in his favor and against Defendant ACT for lost wages, lost benefits, the lost value of his equity share in Defendant ACT, compensatory damages, punitive damages, attorney's fees and costs, pre-judgement interest, post-judgement interest, and for such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues herein.

Respectfully submitted,

JOHN BREEDEN

By: */s/ Kate Sedey*
One of Plaintiff's Attorneys

Kate Sedey
Kristin M. Case
The Case Law Firm, LLC
250 S. Wacker Drive, Suite 230
Chicago, Illinois 60606
Telephone (312) 920-0400
Facsimile (312) 920-0800